UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                           :

TAMMY GIBSON,
                           :

              Plaintiff,       **REPORT AND RECOMMENDATION**
                           :

       -against-              07 Civ. 2845 (RMB)(KNF)
                           :

COMMISSIONER OF SOCIAL SECURITY,
                           :

           Defendant.      :
-------------------------------------------------------------- X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE RICHARD M. BERMAN, UNITED STATES DISTRICT JUDGE

## INTRODUCTION

Plaintiff Tammy Gibson ("Gibson"), proceeding pro se, brought this action, pursuant to

the Social Security Act ("SSA"), 42 U.S.C. §§ 301-1397jj, as amended, challenging the final

determination of the Commissioner of Social Security (the "Commissioner") denying her a

claimed period of disability and disability insurance benefits ("DIB"), pursuant to Title II of the

SSA, Federal Old-Age, Survivors, and Disability Insurance Benefits, 42 U.S.C. §§ 401-434, for

the period May 1, 1992, through December 31, 1997, the date she was last insured.  The

Commissioner filed an answer seeking affirmance of his determination and dismissal of the

complaint.  Thereafter, the plaintiff engaged counsel.  On January 4, 2008, the plaintiff made a

motion for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), seeking reversal of the

Commissioner's determination.  The Commissioner opposed the motion and, on January 7, 2008,

made a cross-motion for judgment on the pleadings, seeking affirmance of his decision.

On May 1, 2008, upon determining that the record was incomplete, the Court directed the

defendant to supplement the record by filing and serving the plaintiff's June 4, 2000 application,

filed protectively with the Social Security Administration, for Supplemental Security Income

("SSI") benefits.  On June 10, 2008, the defendant filed the supplemental record.  In a letter,

dated June 9, 2008, the defendant informed the Court that, although the Administrative Law

Judge ("ALJ") referred to the plaintiff's SSI "application as being dated June 4, 2000," the

plaintiff "signed her application on June 4, 2001."  Moreover, the defendant advised the Court,

the plaintiff's "SSI application was consolidated with the plaintiff's then-pending hearing for

disability insurance benefits" and "because of this consolidation, there was no separate

determination made regarding plaintiff's SSI application at the initial or reconsideration level."

## BACKGROUND

*Administrative Proceedings*

After filing, on May 16, 2000, protectively, Gibson filed, on June 23, 2000, an application

for DIB, pursuant to Title II of SSA, alleging she was unable to work as of May 1, 1992.  (Tr. 82-

84).  The application was denied initially, and Gibson was found not disabled through the

determination date, September 13, 2000.[1]  (Tr. 27, 29-32).  The initial disability determination

and transmittal form indicated "Osteoarthrosis & Allied Disorders" as the primary diagnosis.

(Tr. 27).  The denial of Gibson's applications was affirmed, upon reconsideration, on February 8,

---

[1] Gibson's initial application determination was made on September 13, 2000, but a Notice of Disapproved Claim, sent to Gibson by the Social Security Administration, was dated September 19, 2000.

2001,[2] and Gibson was found not disabled through the date Gibson was last insured for disability benefits, December 31, 1997.  (Tr. 28, 34-35).  The reconsideration disability determination and transmittal form indicated "Affective Disorder" as the primary diagnosis.  (Tr. 28).

Thereafter, on June 4, 2001, Gibson requested a hearing before an ALJ and submitted additional evidence in support of her application for benefits.  (Tr. 36).  On the same day, Gibson filed an application for SSI benefits.  (Tr. 417-419).  On July 16, 2001, Gibson appeared for a hearing before the ALJ.  (Tr. 290-300).  The ALJ postponed the hearing in order for Gibson to retain counsel and to ensure that all necessary records would be obtained.  (Tr. 290-300).  On October 21, 2002, at the request of Gibson's counsel, the ALJ adjourned the hearing anew, in order to obtain consultative examinations of Gibson and more recent medical records.  (Tr. 302-314).

On December 2, 2004, Gibson, represented by counsel, appeared for the hearing before the ALJ.  (Tr. 316-416).  On January 4, 2005, the ALJ determined that Gibson: (a) was not entitled to a period of disability or to disability insurance benefits, pursuant to Title II of the SSA, because of her failure to establish that she was disabled on or before December 31, 1997, the date she was last insured; and (b) was disabled since December 21, 1998, for the purpose of establishing eligibility for supplemental security income benefits, under Title XVI of the SSA.  (Tr. 17-26).  On January 20, 2007, the Appeals Council, Office of Disability Adjudication and Review, denied Gibson's request for review; thus, rendering the ALJ's determination the final decision of the Commissioner.  (Tr. 7-9).  The instant action followed.

---

[2]  Gibson's reconsideration application determination was made on February 8, 2001, but a Social Security Notice of Reconsideration, sent to Gibson by the Social Security Administration, was dated February 13, 2001.

*Non-Medical Evidence*

Gibson was born in 1964.  (Tr. 82).  She graduated from high school in 1982.  (Tr. 113).

In 1986, Gibson worked as a filing clerk.  (Tr. 325).  From 1988 to 1990, she worked as a

telephone receptionist in a recording company and, in 1991-1992, she was employed, by another

recording company, to answer telephone calls and to ship press kits and compact discs.  (Tr. 326-

28).  While Gibson was pregnant, in 1992, she fell in her bath tub and hurt her back.  (Tr. 328-

29).  On August 19, 1996, Gibson completed a Request for Medical Exemption with the Health

Services Systems, Inc., requesting a review of her employability status and indicating she

suffered from migraines and lower back pain.  (Tr. 203).  Gibson underwent a two-part medical

examination, on August 20 and 22, 1996.  (Tr. 203).  Gibson was last insured on December 31,

1997.  (Tr. 88).

Gibson testified that she has a lot of pain and her back "locks" often.  (Tr. 332).  Gibson

stated she does not go out of her home much, because she does not like "to be in crowds."  (Tr.

332).  She also testified that, in 1999, she consulted a psychiatrist for depression and anxiety,

from which she started suffering before she became pregnant.  (Tr. 330).  Gibson reported she

was raped in 1999.  (Tr. 33, 114, 278).  She sought help at the urging of her daughter's

grandmother, because she had eating and alcohol problems, as well as crying episodes, resulting

from her memories of childhood abuse.  (Tr. 114, 366-67, 278).  According to Gibson, her back

problem, as well as her psychiatric problems, did not improve with time.  (Tr. 332-33).

In describing how she spent her day, Gibson explained she had difficulty dressing but was

able to feed herself.  (Tr. 334).  Gibson explained that she lived with her minor daughter and her

daughter's grandmother and, further, that her daughter's grandmother did all the cooking, laundry

and cleaning for her. (Tr. 334-36). Gibson testified that she spent most of her days in her room, where she eats and watches television. (Tr. 336-38). Although she is able to read, she does not read due to a lack of focus. (Tr. 338-39). Gibson stated she has no friends and does not attend church or any social activities, because she does not like to go out. (Tr. 339). Gibson testified she can lift a gallon of milk, but she cannot sit, stand, walk or climb stairs for a long time, due to her back pain. (Tr. 340-42). She stated she also had difficulty sleeping. (Tr. 344). Gibson did not receive mental health treatment before 1999 or after June 2001. (Tr. 333, 366).

*Medical Evidence*

Gibson started her treatment with Dr. Lewis Marshall ("Dr. Marshall"), Queens Medical Group ("QMG"), on December 5, 1991. (Tr. 185). A clinical laboratory report, issued on March 29, 1992, confirmed that Gibson was pregnant. (Tr. 167). Dr. Marshall noted, in his October 7, 1992 letter to Ms. Sheila Akins, that Gibson was diagnosed initially with lower back pain, secondary to spasms, as a result of a fall, on April 7, 1992. (Tr. 185). She was treated on May 9, May 15, June 15 and June 30, 1992, for "lumbar sacral sprain." (Tr. 185, 191-92). During the May 9, 2002 visit, Gibson exhibited tenderness on palpitation of the left paraspinal area, tight muscles and a trigger point in the left sciatic area. (Tr. 191). At the May 15, 1992 visit, Gibson complained of back spasms, especially after prolonged sitting or standing, but showed no swelling or deformity. (Tr. 192). On June 30, 1992, Gibson admitted to performing heavy lifting work. (Tr. 192). She exhibited a slight reduction in range of motion, straight leg raising was negative and her back was not tender. (Tr. 192). Back strain was noted during that visit. (Tr. 192). Dr. Marshall also indicated, in his October 7, 1992 letter, that Gibson exhibited numbness and parathesia of the lower extremities, on July 1, 1992. (Tr. 185). However, June 15, 1992 and

5

July 1, 1992 visits are not reflected in QMG's clinical notes.

On July 8, 1992, Gibson complained about chronic back pain. (Tr. 194). She had positive straight leg raising without neurosensory deficiencies. (Tr. 194). At that visit, the following diagnosis of Gibson was made: pregnancy, with a fibroid, and a lumbar sacral sprain. (Tr. 194). On August 17, 1992, Dr. Marshall noted that Gibson had dependent edema of her lower extremities with trace protein and sugar. (Tr. 183). Dr. Marshall placed Gibson on strict bed rest. (Tr. 180, 194). On September 2, 1992, Dr. Marshall wrote Gibson had "intractable lower back pain resulting from either renal vs uterus pathology." (Tr. 174). Dr. Marshall noted high risk pregnancy, along with low back syndrome with aching, and placed Gibson on strict bed rest secondary to effacement. (Tr. 179, 198).

On October 7, 1992, Dr. Marshall indicated Gibson was 32-weeks pregnant with an impingement syndrome of her nerve which inhibits her ability to ambulate, stand for prolonged periods, lift and bend. (Tr. 184). He prescribed strict bed rest with close monitoring. (Tr. 184). On October 21, 1992, Gibson had a physical examination which revealed spasms in her vertebral muscles. (Tr. 193). On November 24, 1992, Dr. Marshall noted low back syndrome and sciatica. (Tr. 186). He also noted that Gibson was unable to return to work until December 22, 1992. (Tr. 186). Gibson visited Dr. Moshe Olsted ("Dr. Olsted"), from July 31, 1997, to July 17, 1998, who noted she reported a history of lower back pain for more than four years and a long history of migraines. (Tr. 222-24). Dr. Olsted prescribed medication for Gibson's lower back syndrome and her headaches. (Tr. 222-24). In 1997, Gibson presented herself to the Catholic Medical Center of Brooklyn & Queens ("CMCBQ") where she complained about low back pain for the past five years and a history of migraines. (Tr. 264-68). CMCBQ diagnosed

her with low back pain and migraine and recommended an x-ray and a neurosurgical

consultation.  (Tr. 268).  On December 2, 1999, Gibson visited Elmhurst Hospital Center where

she reported waking up and gasping for air; this prompted the attending physician to suspect

sleep apnea.  (Tr. 270-71).

Gibson was treated in the Bleuler Psychotherapy Center, Inc. ("BPC") from December

21, 1999, through June 21, 2001, where she attended weekly psychotherapy as well as monthly

psychiatric sessions.  (Tr. 229-59).  In July 2000, Dr. Shoudu Zeng ("Dr. Zeng") diagnosed

Gibson with a long history of depressive disorder, anxiety and intermittent periods of bulimia.

(Tr. 205).  He noted that her depressive symptoms and anxiety impaired her ability to function

and that she reported insomnia, frequent crying spells, depressed mood, some agoraphobia, social

isolation and extreme panic, especially in public places.  (Tr. 205).  Dr. Zen indicated that Gibson

was receiving the medications Paxil, Zyprexa and Ambian.  (Tr. 205).  In evaluating Gibson's

mental status, Dr. Zen noted she was cooperative, intelligent and perceptive, although she was

guarded at times and her ability to articulate clearly was affected by symptoms of depression and

anxiety she was experiencing.  (Tr. 206).  Although Dr. Zen noted Gibson had difficulty

concentrating, he also noted her orientation, memory, information and ability to perform

calculations were within normal limits.  (Tr. 206).  Dr. Zen described Gibson's judgment as

intact and stated she demonstrated the capacity for insight, but her depressive symptoms needed

to be alleviated.  (Tr. 206).  In making Gibson's functional assessment, Dr. Zen indicated

Gibson's difficulty maintaining the activities of daily living during the period of tremendous

anxiety and stated she would have tremendous difficulty at a work setting at that time.  (Tr. 207).

Dr. Zen also noted that, at times of increased anxiety, Gibson had difficulty with cognitive

7

functions and concentration. (Tr. 208). Gibson's social interaction and her ability to adapt, during the period of anxiety, were limited. (Tr. 208).

On January 4 and May 24, 2001, Dr. Rebecca Werkin ("Dr. Werkin") stated that Gibson suffered from severe debilitating anxiety with panic attacks as well as depressive symptoms, which prevented her from functioning in any work environment. (Tr. 210-11). On June 21, 2001, Dr. Werkin completed a termination summary noting that Gibson's depressive symptoms and anxiety were chronic and severe and that she had great difficulty managing any psycho-social stressors. (Tr. 229). Gibson's final diagnosis was post traumatic stress disorder. (Tr. 229).

On November 13, 2003, Dr. David M. Burke ("Dr. Burke") performed an initial consultative neurological examination. (Tr. 273-74). Gibson reported to Dr. Burke that she suffered from chronic low back pain and constant muscle spasms, but denied: (i) shortness of breath; (ii) chest pain; (iii) weakness; (iv) tingling sensations; or (v) urinary or fecal incontinence. (Tr. 273). On examination, Dr. Burke indicated Gibson was alert and oriented, her speech was spontaneous and fluent and no evidence of dysarthria was present. (Tr. 273). Dr. Burke also noted, inter alia, that Gibson's memory and concentration were good and she was able to ambulate and the gait station was good. (Tr. 274). Dr. Burke's impression was that Gibson had lumbago and that her condition, although chronic, should improve with proper anti-inflammatory medications and physical therapy. (Tr. 274).

On February 10, 2004, Dr. Rochelle Sherman ("Dr. Sherman") conducted an evaluation of Gibson's intellectual functioning. (Tr. 275-77). In her observation of Gibson's behavior, Dr. Sherman indicated that Gibson did not display any unusual mannerisms or behavior and that her attention and concentration were adequate for completing tasks. (Tr. 276). No evidence was

8

present of restlessness or overactivity and Gibson's affect was labile. (Tr. 276). The results of

the testing performed demonstrated Gibson's reading skills were between the fifth and sixth

grade level and her writing and arithmetic skills were at the fourth grade level. (Tr. 276).

Administration of a standardized intelligence scale Wechsler-III test yielded a full scale

intelligence quotient ("IQ") of 67, a verbal scale IQ of 70 and a performance scale IQ of 70. Dr.

Sherman opined that Gibson's overall level of intellectual functioning was within the impaired

range. (Tr. 277). Dr. Sherman stated that Gibson is able to attend to, comprehend, remember

and carry out basic instructions with a marginally adequate degree of accuracy and speed and that

she appears capable of participating in work related activities. (Tr. 277). Dr. Sherman diagnosed

Gibson with: (i) a mixed learning disorder; (ii) anxiety disorder; (iii) depression not otherwise

specified; and (iv) mild mental retardation. (Tr. 277). Dr. Sherman also opined that Gibson's

prognosis was fair to poor and that she would benefit from vocational training. (Tr. 277).

On February 10, 2004, Dr. Renee Ravid ("Dr. Ravid") performed a psychiatric evaluation

of Gibson. (Tr. 278). Dr. Ravid noted that Gibson's current information indicated mental

problem but medical or psychiatric reports were not available. (Tr. 278). Gibson reported to Dr.

Ravid that she was molested at the age of four, by male relatives with whom she was left by her

mother, and that she endured other childhood abuse, as well as a rape in 2001, which she did not

report. (Tr. 278). Gibson reported to Dr. Ravid that she was not undergoing any psychiatric

treatment because she did not have insurance. (Tr. 278). In examining Gibson's mental status,

Dr. Ravid noted that Gibson's mood was dysphoric and she appeared anxious and timid during

the interview. (Tr. 278). He also indicated that no evidence existed of perceptual disturbance,

Gibson's memory was fair and her concentration was somewhat impaired. (Tr. 278). Dr. Ravid

9

observed Gibson was able to perform most but not all simple computations, she had average

intellectual functioning but her insight and judgment were somewhat limited, and she appeared

marginally capable of managing benefits.  (Tr. 278).

Dr. Ravid opined that Gibson had a satisfactory ability to understand, carry out and

remember instructions but had impairments in ability to respond appropriately to supervision,

coworkers and work pressures in a work setting.  (Tr. 279).  Dr. Ravid also opined that Gibson

had: (a) difficulty relating to others; (b) reduced tolerance to stress;(c) avoiding behavior; and

(d) anxiety like attacks.  (Tr. 279).  Gibson appeared to be socially isolated.  (Tr. 279).  Dr. Ravid

noted that no acute psychotic symptoms were elicited, and Gibson appeared able to manage her

benefits.  (Tr. 279).  In diagnosing Gibson, Dr. Ravid ruled out: panic disorder; posttraumatic

stress disorder; dysthymic disorder; social phobia; and personality disorder not otherwise

specified.  (Tr. 279).  Dr. Ravid suggested Gibson may benefit from psychiatric treatment and

that her prognosis with treatment and compliance was fair.  (Tr. 279).

Dr. Michael Friedman ("Dr. Friedman") testified as a medical expert in psychology, at the

December 2, 2004 hearing.  (Tr. 65-70, 347-69).  He opined, based on his review of Gibson's

medical records, that she suffered from major depressive disorder, agoraphobia and panic

disorder with agoraphobia.  (Tr. 350).  Dr. Friedman believed that Gibson's IQ results were

depressed by her emotional state; however, he did not believe she was a retarded person.  (Tr.

351, 354).  Dr. Friedman indicated that, although Gibson testified at the hearing that she suffered

from depression before her pregnancy, nothing in the medical records substantiated that

contention.  (Tr. 358-59).  Gibson had a medically documented history of a chronic affective

disorder of at least two years duration, which caused her more than a minimal limitation of

10

ability to do basic work activities. (Tr. 363-64). Dr. Friedman stated that, as of the time Gibson

began treatment at BPC, she met the requirements of Listing 12.04 C, affective disorders. (Tr.

367). Dr. Friedman opined that Gibson's disease process resulted in such marginal adjustment

that even a minimal increase in mental demands or a change in environment would cause her to

decompensate. (Tr. 365). However, Dr. Friedman noted, no evidence substantiated an onset date

of Gibson's limitations earlier than a year prior to the commencement of her treatment by BPC.

(Tr. 359-60, 369).

Dr. Warren Cohen ("Dr. Cohen") testified as a medical expert in neurology at the

December 2, 2004 hearing, based on his review of Gibson's medical records. (Tr. 79-80, 370-

411). Dr. Cohen stated that the medical impairment that is supported by the record would be a

nonspecific diagnosis that would describe low back pain of no clear ideology, such as lumbago,

or lumbar myofacial syndrome. (Tr. 384). However, Dr. Cohen noted, Gibson's 1992 diagnosis

was confusing because it lacked specific findings. (Tr. 385-86). Dr. Cohen also indicated that

Dr. Olsted's notes from 1997 and 1998 do not provide sufficient descriptive details of the

symptoms or his examination. (Tr. 392). Dr. Cohen opined that Gibson had pain problems in

1992, 1997 and 1998, but was unable to infer, from the medical record, that the pain existed

between 1992 and 1997. (Tr. 392-93, 396).

## DISCUSSION

*Standard of Review*

Fed. R. Civ. P. 12(c) provides, in pertinent part, that "[a]fter the pleadings are closed –

but early enough not to delay trial – a party may move for judgment on the pleadings."

"Judgment on the pleadings is appropriate where material facts are undisputed and where a

judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988). In determining a motion under Fed. R. Civ. P. 12(c), a court is required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in favor of the nonmoving party. See Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir. 2002).

The SSA provides, in pertinent part, that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The findings of the Commissioner as to any fact are conclusive, if they are supported by substantial evidence. See 42 U.S.C. § 405(g). "The court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Secretary of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984). However, "[i]t is not the function of a reviewing court to decide de novo whether a claimant was disabled, or to answer in the first instance the inquiries posed by the five-step [disability] analysis set out in [the SSA] regulations" or to "affirm an administrative action on grounds different from those considered by the agency." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (internal citation omitted).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct.

1420, 1427 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206,

217 [1938]).  "The substantial evidence standard applies not only to the Commissioner's findings

of fact, but also to [the Commissioner's] inferences and conclusions, which must be affirmed

even where the Court's own analysis may differ."  Toribio v. Barnhart, No. 02 Civ. 4929, 2003

WL 21415329, at *2 (S.D.N.Y. June 18, 2003).  A failure, during the administrative process, to

adhere to procedural requirements imposed by the regulations promulgated under the SSA is

treated as a legal error.  See Thomas v. Barnhart, No. 01 Civ. 518, 2002 WL 31433606, at *4

(S.D.N.Y. Oct. 30, 2002).  The ALJ has an affirmative "obligation to develop the record in light

of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is

represented by counsel."  Shaw, 221 F.3d at 131; see Echevarria v. Sec'y of Health and Human

Servs., 685 F.2d 751, 755 (2d Cir. 1982).  "Other areas of legal error include misapplication of

the five-step sequential analysis or failure to properly apply the 'treating physician rule.'"  Van

Dien v. Barnhart, No. 04 Civ. 7259, 2006 WL 785281, at *9 (S.D.N.Y. Mar. 24, 2006) (citing 20

C.F.R. §§ 404.1520; 416.920; 404.1527(d)(2); 416.927[d][2]).

*Determination of Disability*

    Title II of the SSA, as amended, 42 U.S.C. §§ 401-434, "provides for the payment of

insurance benefits to persons who have contributed to the program and who suffer from a

physical or mental disability."  Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2290

(1987).  Title XVI of the SSA, as amended, 42 U.S.C. §§ 1381-1385, "provides for the payment

of disability benefits to indigent persons under the [] SSI program."  Id.  To receive federal

disability benefits, under both Title II and Title XVI, a claimant must establish inability "to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c (a)(3)(B). A physical or mental impairment must be demonstrable by "medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3),1382c (a)(3)(D). In determining whether a claimant's impairment constitutes a disability under the SSA, the Commissioner must "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. §§ 423(d)(2)(B), 1382c (a)(3)(G).

The regulations promulgated under the SSA require the Commissioner to apply a five-step sequential evaluative analysis to determine disability. See 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described this sequential procedure in Shaw, 221 F.3d at 132, as follows:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
> 2. If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.
> 3. If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.
> 4. If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The

Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Both objective and subjective factors must be considered by the Commissioner when determining disability; they include: "(1) objective medical facts; (2) diagnoses or medical opinions based on these facts; (3) subjective evidence of pain and disability testified to by the claimant and family or others; and (4) the claimant's educational background, age, and work experience." Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983). If the Commissioner finds that a claimant is disabled or not disabled at a step, he makes his determination or decision and does not proceed to the next step. See 20 C.F.R. §§ 404.1520, 416.920.

At the hearing, the ALJ consolidated, as provided by the SSA regulations, Gibson's DIB and SSI claims, although no initial or reconsideration decision was made by the Social Security Administration with respect to her SSI claim.[3] See 20 C.F.R. §§ 405.365, 416.1452. The ALJ determined that Gibson met the requirements of the first of the five steps of the sequential analysis, because she had not engaged in substantial gainful activity since May 1, 1992. At the second step of the five-step sequential analysis, the ALJ determined that, for the period from May 1, 1992, through December 20, 1998, Gibson's impairments did not place more than a *de minimus* limitation on her ability to function for at least 12 months and, consequently, Gibson did not have a medically determinable "severe" impairment that lasted or could be expected to last

---

[3] The ALJ misstated the facts when he stated: "On June 4, 2000, [Gibson] protectively filed an application for supplemental security income benefits." Gibson filed her SSI application on June 4, 2001. The ALJ also misstated the facts when he stated that Gibson's "applications were denied initially on September 19, 2000" and that "her applications were again denied on reconsideration on February 13, 2001." Only Gibson's DIB application was denied initially, on September 19, 2000, and on reconsideration, on February 13, 2002. Gibson's SSI application was never determined initially or on reconsideration.

for a period of not less than 12 months.  The ALJ concluded that Gibson was not under a

disability during that period, and is not entitled to a period of disability and disability insurance

benefits, under the SSA's Title II.

*Step Two of the Five-Step Sequential Analysis*

Gibson contends the ALJ erred at step two of the sequential analysis, because he "offered

no probative support for his finding that the claimant's mental or other impairments prior to the

expiration of insured status were *De Minimis*."  Moreover, according to Gibson, the ALJ "did not

demonstrate reasonable efforts to develop the evidence relating to the alleged earlier onset of the

claimant's concededly currently disabling mental impairments" and "did not rationally support his

conclusion that because there were no treatment records in the file relating to the period last

insured, [] the claimant had not been severely impaired during that period."  The defendant

contends: (i) the ALJ explained adequately the basis for his decision to deny Gibson's claim for

the period prior to December 31, 1998; and (ii) the ALJ developed the record fully.

At step two of the five-step sequential analysis, the ALJ concluded that Gibson "did not

have a documented, medically determinable impairment that lasted for at least 12 months prior to

December 21, 1998, which is 12[] months before she started psychiatric treatment at the Bleuler

center."  This conclusion was based on the following factual findings noted by the ALJ:

(a) Gibson complained of back pain in 1992; (b) she complained of possible sciatica in 1992,

which improved after her pregnancy; (c) Gibson reported back pain "on and off" in 1997 and

1998; (d) "[t]here are no radiographic findings;" (e) in 2003, Gibson complained about back pain

but was diagnosed with "lumbago," a "descriptive term not specifying any cause;" (f) "it is

impossible to tell whether there is a medical basis for her pain after 1992;" (g) "there are no

treatment records for mental impairments prior to December 21, 1999;" (i) "it was not possible to tell from the records whether she had mental impairments or how severe they were before that." Additionally, the ALJ determined that Gibson "may have had a learning disorder prior to December 21, 1998." However, the ALJ stated: "Since there is no evidence from which the severity of her learning disorder prior to December 21, 1998, can be determined, I conclude that it was not "severe." The ALJ's conclusion that Gibson's impairments, during the period May 1, 1992, through December 20, 1998, "did not place more than a *de minimis* limitation on her ability to function for at least 12 months," was based on the absence of evidence in the record, as noted above. The ALJ stated so when he recognized: (i) "it was impossible to tell whether there is a medical basis for her pain after 1992;" (ii) "it was not possible to tell from the records whether she had mental impairments or how severe they were before [1999];" and (iii) " there is no evidence from which the severity of [Gibson's] learning disorder prior to December 21, 1998, can be determined."

The ALJ considered Gibson's impairments pertaining to her back pain and mental problems separately, before finding that she "had medically determinable lower back pain in 1992 that did not last for at least 12 months and had back pain in 1997 and 1998 and in 2003 that is not medically determinable" and "also may have had a medically determinable learning disorder, but it is not severe." However, despite determining that: (a) at least in 1992, Gibson had a medically determinable impairment; (b) in 1997, 1998 and 2003, she had pain that was not medically determinable; and (c) she may have had a medically determinable learning disorder, the ALJ failed to consider what effect, if any, each impairment had, during the period May 1, 1992, through December 20, 1998, on Gibson's physical or mental capacities to do basic work

17

activities, meaning, perforce of the regulations, the abilities and aptitudes necessary to do most

jobs. They include: (1) physical functions such as walking, standing, sitting, lifting, pushing,

pulling, reaching, carrying or handling; (2) capacities for seeing, hearing and speaking;

(3) understanding, carrying out and remembering simple instructions; (4) use of judgment;

(5) responding appropriately to supervision, co-workers and usual work situations; and

(6) dealing with changes in a routine work setting. See 20 C.F.R. §§ 404.1520(c), 404.1521,

416.920, 416.921. The Court finds that the ALJ's failure to consider the impact of each

impairment on Gibson's physical or mental abilities to do basic work activities, as required by

the SSA regulations, is a legal error.

Even when "an impairment is not severe and has no more than a minimal effect on an

individual's physical or mental ability(ies) to do basic work activities, the possibility of several

such impairments combining to produce a severe impairment must be considered." Social

Security Ruling 85-28 ("SSR 85-28"), Program Policy Statement: Titles II and XVI: Medical

Impairments That Are Not Severe, 1985 WL 56856 (S.S.A.). "[W]hen assessing the severity of

whatever impairments an individual may have, the adjudicator must assess the impact of the

combination of those impairments on the person's ability to function, rather than assess

separately the contribution of each impairment to the restriction of his or her activity as if each

impairment existed alone." SSR 85-28, 1985 WL 56856 (S.S.A.). The Social Security

Administration has cautioned that great care should be exercised in applying the "not severe

impairment" concept and that if an ALJ "is unable to determine clearly the effect of an

impairment or combination of impairments on the individual's ability to do basic work activities,

the sequential evaluation process should not end with the not severe evaluation step." SSR 85-

28, 1985 WL 56856 (S.S.A.). The ALJ's opinion does not indicate that, in reaching his

conclusion: Gibson's "impairments did not place more than a *de minimis* limitation on her ability

to function for at least 12 months," he considered the impact of Gibson's impairments, in

combination, on her physical or mental abilities to do basic work activities. The Court finds that

the ALJ's failure to consider the impact of Gibson's impairments, in combination, on her

physical or mental abilities to do basic work activities, as required by the SSA regulations, is a

legal error.

       In his determination that Gibson's learning disorder prior to December 21, 1998, "was not

severe," the ALJ relied, inter alia, on Gibson's testimony that "she graduated from high school in

regular education" and that "she used to work as a filing clerk and as a receptionist, which is

semiskilled work and indicates the ability to do mental work." This reliance, in support of his

finding of non-severity, is inconsistent with the ALJ's finding that "[t]he claimant's statements

regarding the severity of her symptoms and the degree of functional limitations are not fully

credible as they relate to the period between May 1, 1992 and December 20, 1998." The ALJ's

reliance on Gibson's statements, found to be "not fully credible," in determining that her

impairments during that period were not severe, is misplaced. "It is not sufficient for the

adjudicator to make a single, conclusory statement that 'the individual's allegations have been

considered' or that 'the allegations are (or are not) credible.'" Social Security Ruling 96-7P

("SSR 96-7P"), Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in

Disability Claims: Assessing the Credibility of an Individual's Statement, 1996 WL 374186

(S.S.A.). The ALJ's decision "must contain specific reasons for the finding on credibility,

supported by evidence in the case record, and must be sufficiently specific to make clear to the

individual and to any subsequent reviewers the weight the adjudicator gave to the individual's

statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186 (S.S.A.).  In the

instant case, all the ALJ did was recite Gibson's testimony.  The ALJ failed to articulate: (i) what

portion of Gibson's testimony he found incredible; (ii) why he found it incredible; (iii) what

evidence in the record supports his finding of incredibility; (iv) what weight he gave to Gibson's

statements; and (v) the reason for that weight.  Additionally, the ALJ failed to indicate he

considered: the consistency of Gibson's statements; the degree to which her statements are

consistent with her medical history; or the consistency of Gibson's statements with other

information in the record.  The Court finds that the ALJ's failure to provide specific reasons for

his finding on Gibson's credibility and his failure to support his finding with specific evidence

from the record constitutes legal error.

Gibson also argues that the ALJ erred when he denied her DIB claim at step two of the

sequential analysis because step two "is a *de minimis* threshold standard permitting rejection only

of claims based upon most trivial impairments."  The defendant contends the ALJ did not err

when he determined that Gibson's impairments were not severe during the period prior to

December 31, 1998.

The Supreme Court has stated that the "severity regulation increases the efficiency and

reliability of the evaluation process by identifying at an early stage those claimants whose

medical impairments are so slight that it is unlikely they would be found to be disabled even if

their age, education, and experience were taken into account."  Bowen, 482 U.S. at 153, 107 S.

Ct. at 2297.  The ALJ in this case consolidated Gibson's DIB and SSI claims.  The ALJ may

consolidate a hearing when "[o]ne or more of the issues to be considered at [the] hearing is the

same as an issue involved in another claim [that is] pending before [the Social Security Administration]." 20 C.F.R. §§ 405.365, 416.1452. For the purpose of consolidation, the Social Security Administration policy states that when a Title II or Title XVI claim is pending at the initial, reconsideration or hearing level, "a common issue is present when two or more claims, in any combination, share an overlapping period of time, all have the same medical or substantial gainful activity (SGA) issue." DI 12045.010 ("DI 12045.010"), Processing Disability Claims at Different Levels of Appeal, Title II and Title XVI-Common Issue Cases. The policy also states that "[b]oth claims will not be considered at the hearing level if the [ALJ] does not agree that there is a common issue or that the claim should be joined, or if the claimant objects to joining the claims." DI 12045.010. Since Gibson did not object to consolidation of her DIB and SSI claims, and the ALJ consolidated these two claims, it follows that the ALJ determined that a common issue was present in two claims because they shared an overlapping period of time and have the same medical or substantial gainful activity issues. Where the ALJ: (i) consolidated Gibson's DIB and SSI claims; (ii) issued a consolidated decision concerning those two claims; and (iii) determined, at step two of the sequential analysis, that Gibson's impairments were not severe, during the period May 1, 1992, through December 20, 1998, the ALJ's analysis should have terminated at step two, resulting in a finding that Gibson was not disabled. See 20 C.F.R. §§ 405.1520 (a)(4)(ii), 416.920 (a)(4)(ii). However, after determining, at step two of the sequential analysis, that Gibson's impairments were not severe during the period May 1, 1992, through December 20, 1998, the ALJ proceeded to step three with respect to Gibson's impairments for the period commencing December 21, 1998. The Court finds that this was a legal error.

If, on one hand, the ALJ considered Gibson's claims separately, because they involved two separate time periods or had different medical and substantial gainful activity issues, or both, he was required to conduct two separate five-step sequential analyses with respect to each DIB and SSI claim. If the ALJ conducted two separate analyses, he was required further to: (i) determine Gibson was not disabled with respect to her DIB claim, after finding, at step two that her impairments were not severe; and (ii) conduct the step two severity analysis with respect to Gibson's SSI claim, before proceeding to step three of the five step sequential analysis on her SSI claim. If, on the other hand, the ALJ conducted a consolidated analysis, he was required to: (a) end his analysis after determining, at step two, that Gibson 's impairments were not severe; or (b) find, at step two, that Gibson's impairments were severe before continuing to step three of the five step sequential analysis. However, the ALJ failed to do any of the above. Instead, the ALJ limited his step two analysis to Gibson's impairments during one time period and commenced his analysis at step three with respect to Gibson's impairments during another time period, without prior determinations that Gibson's impairments were severe during that other time period. A finding of severity is necessary before step three of the five step sequential analysis can be reached. Therefore, the Court finds that, acting as he did, the ALJ committed legal error.

Gibson argues that the ALJ failed to: (i) demonstrate reasonable efforts in order to develop the evidence relating to the alleged onset of Gibson's "currently disabling mental impairments, despite the treating psychiatrist's report of a long history of depression and anxiety;" and (ii) support rationally "his conclusion that because there were no treatment records in the file relating to the period last insured" Gibson had not been impaired severely during that period. Moreover, Gibson contends, the ALJ erred, in the absence of medical evidence, in not

calling lay witnesses, namely Gibson's daughter and her daughter's grandmother, to testify at the

hearing about Gibson's "treatment and symptomatic limitations over time," as suggested by Dr.

Friedman.  According to Gibson, an inquiry was required "to assure that [Dr.] Friedman's

opinion was also the opinion of the claimant's treating psychiatrist for the period at and since the

time last insured."  The defendant contends the ALJ's determination of the onset date of

Gibson's disability was reasonable, because it was based on Dr. Friedman's estimate that "for six

to twelve months prior to beginning treatment, plaintiff may have had a period of increasing

distress," but no medical evidence in the record substantiated a start date any earlier than a year

prior to the beginning of Gibson's treatment at BPC.  Additionally, the defendant asserts, the

ALJ developed the record fully and no need existed to call lay witnesses to testify because the

ALJ had "ample basis upon which to infer the onset" date of Gibson's disability.

  Dr. Friedman's opinion, based on his experience as a program director and chief

psychologist at a retarded persons' day-treatment center and his observation of Gibson during the

administrative hearing, that Gibson was not a retarded person, contradicted that of Dr. Sherman,

who, upon examining and administering tests to Gibson, determined that she had mild

retardation.  The ALJ's determination that "Dr. Friedman testified credibly that [Gibson's] poor

performance on the IQ test in 2004 was mostly due to her depression" is erroneous because Dr.

Friedman testified that Gibson's IQ results "were probably depressed by her emotional state" and

that, although she was genuine in her present distress and was never described as a malingerer, he

did "think that her depression was a limiting factor in how she performed."  Even assuming that

Gibson's depression was a limiting factor during her performance on the IQ testing, that

statement does not provide substantial evidence for a determination that her poor performance

"was mostly due to her depression."  The ALJ also stated erroneously that "Dr. Friedman

testified, it is not reasonable to assume that [Gibson's] depression or panic disorder started more

than 12 months before she started treatment.  However, Dr. Friedman testified he presumed "that

there was a period of time before [Gibson] began treatment where, [] in fact, her limitations rose

to the [present] level []."  When asked by the ALJ "[h]ow long would it be reasonable to assume"

Gibson's mental impairments existed before she commenced her mental treatment, Dr. Friedman

responded: "It's really hard to say.  It's speculative."  He stated that "[m]aybe six months, a year"

would be "normal."  However, Dr. Friedman stated, "[t]he records aren't there" and "whatever

evidence is not substantial enough to make any conclusions."  In fact, Dr. Friedman opined that

an assumption, based on Gibson's record, about how much time prior to the commencement of

treatment Gibson's mental impairment "rose to the level [of her current limitations]" would be

speculative, but that assuming sixth months to a year would be "normal."  He expressed no

opinion on whether it would be unreasonable to assume that Gibson's condition started more

than 12 months prior to the commencement of her treatment, but only stated that the evidence

before him was "not substantial enough to make any conclusion."

  That no evidence exists to conclude how far back in time Gibson's condition existed and

that, in abstract, six months to a year is typically a reasonable estimate of how much time prior to

treatment impairments existed, is not sufficient to support the conclusion that it is not reasonable

to assume Gibson's condition started more than 12 months prior to the commencement of her

treatment.  "If reasonable inferences about the progression of the impairment cannot be made on

the basis of the evidence in file and additional relevant medical evidence is not available, it may

be necessary to explore other sources of documentation," including information from family

members, friends and former employers, in order to furnish additional evidence regarding the

course of the individual's condition.  Social Security Ruling 83-20 ("SSR 83-20"), Program

Policy Statement, Titles II and XVI: Onset of Disability, 1983 WL 31249.  The ALJ made an

inference about the onset date of Gibson's disability based on the absence of evidence from the

record and a misunderstanding of Dr. Friedman's testimony.  The ALJ failed to develop the

record by calling lay witnesses or an inferential diagnosis expert witness in order to infer

reasonably the onset date of Gibson's disability.  Therefore, the Court finds that no substantial

evidence supports the ALJ's finding that Gibson's disability could not have started more than 12

months before she started her psychiatric treatment.

### CONCLUSION

For the reasons set forth above, I recommend that the plaintiff's motion, for judgment on

the pleadings, made pursuant to Fed. R. Civ. P. 12(c), be granted and the defendant's cross-

motion, for judgment on the pleadings, made pursuant to Fed. R. Civ. P. 12(c), be denied.  I

recommend further that: (i) the Commissioner's decision be reversed without remand for a

rehearing; and (ii) the Commissioner be directed to award the plaintiff benefits in accordance

with this report and recommendation.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure,

the parties shall have (10) days from service of this Report to file written objections.  See

also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the

Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard M.

Berman, 500 Pearl Street, Room 650, New York, New York, 10007, and to the chambers of the

undersigned, 40 Centre Street, Room 540, New York, New York, 10007. Any requests for an

extension of time for filing objections must be directed to Judge Berman. FAILURE TO FILE

OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS

AND WILL PRECLUDE APPELLATE REVIEW. See Thomas v. Arn, 474 U.S. 140, 470

(1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F. 3d 1049, 1054 (2d Cir. 1993); Frank v.

Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 58-59 (2d

Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
     July 15, 2008

Respectfully submitted,

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

Mailed copies to:

Herbert Forsmith, Esq.
Susan C. Branagan, Esq.